WILLIAM E. BARKLEY v. MAURICE QUICK and Arthur Quick.

(156 N. W. 544.)

Suit for supervising and aiding in the sale of a building and for premiums advanced by plaintiff upon insurance policies.

Insurance — premiums — evidence — case — jury — sufficient to warrant submission to — sale.

1. Evidence examined and held sufficient to require the submission to the jury of the first cause of action, to wit, the $500 services claimed by plaintiff

to have been performed in looking after the building and aiding in effecting a sale.

**Case — evidence — submission to jury — premiums — insurance policies.**

2. Evidence examined and held sufficient to require the submission to the jury of the second cause of action, to wit, the premiums advanced upon the insurance policies.

**Evidence — conversation — between defendant and another — absence of plaintiff — exclusion.**

3. There was no error in excluding a conversation between defendant and one F. at which plaintiff was not present.

**Instructions of court — jury — proper.**

4. Certain instructions of the court set out in the opinion are without error.

Opinion filed February 9, 1916.

Appeal from the District Court of Pembina County, *Kneeshaw,* J. Affirmed.

*W. J. Mayer* (*F. H. Stubbs* of counsel), for appellants.

A third person who is under no obligation to pay the debt of another cannot without his request, officiously pay that other's debt and recover the amount from the debtor, where the debtor does not ratify such payment. Such a payment is wholly voluntary. 22 Am. & Eng. Enc. Law, 537.

Assent necessarily implies a meeting of minds of all contracting parties,—a coming together upon the common ground of a mutual understanding of facts and of the subject-matter. 7 Am. & Eng. Enc. Law, 113.

There is a total want of mutuality of consideration. Bishop, Contr. § 78.

The trial court in charging the jury can only instruct as to the law. Rev. Codes 1905, § 7021, Comp. Laws 1913, § 7620.

An instruction which assumes the existence of material facts in issue invades the province of the jury and is erroneous, if there be *any* evidence in conflict with such assumption. 11 Enc. Pl. & Pr. 116, 128, 131.

Where the only evidence sufficient upon an essential point is the testimony of a party in his own favor, or of that of a witness interested

in his favor, it is error not to submit the case to the jury.    Abbott, Civil Jury Cases, 3d ed. p. 611.

It is error to assume the existence of a fact in an instruction, though other instructions submitted the question whether ·or not such fact existed.    11 Enc. Pl. & Pr. 116, 121; Bressler v. Schwertferger, 15 Ill. App. 294.

The contract of insurance is a personal contract.    16 Am. & Eng. Enc. Law, 843.

Contracts of fire insurance are not assignable, unless the insurer consents thereto.    13 Am. & Eng. Enc. Law, 185, and cases cited.

The assignment of an insurance policy is effective only when accepted by the insurer.    This is a new contract, and for that reason is only binding when accepted.    1 Jones, Mortg. § 396; Wilson v. Hill, 3 Met. 69; Macomber v. Cambridge Mut. F. Ins. Co. 8 Cush. 133.

Where there is no insurable interest the insured is released from the payment of the premiums.    13 Am. & Eng. Enc. Law, 131.

And the consideration may be recovered back.    13 Am. & Eng. Enc. Law, 101.

*Gray, Myers, & Spiller* (*Berge & McCarty* of counsel), for respondent.

Objection to evidence on the ground of variance nowhere appears in the record.    In this jurisdiction, no variance is material, "unless it has actually misled the adverse party to his prejudice," and this fact, and the manner in which his cause has been prejudiced, must be shown to the satisfaction of the court, to avail the party.    Comp. Laws 1913, § 7478; Maloney v. Geiser Mfg. Co. 17 N. D. 195, 115 N. W. 669; Halloran v. Holmes, 13 N. D. 411, 101 N. W. 310.

It is the rule that if advantage be not taken of a variance at the trial, it will be treated in the appellate court as having been waived. 13 Enc. Ev. 740, ¶ 1; 22 Enc. Pl. & Pr. 640, ¶ 6; 31 Cyc. 756.

The only exception to this rule is where, upon inspection, the variance appears of such a character as that the judgment would not serve to protect the defeated party as to the matter litigated.    13 Enc. Ev. 741, ¶ 3; 22 Enc. Pl. & Pr. 630; 31 Cyc. 756.

Where the insured transfers his interest in the subject-matter insured, and, with the consent of the company, assigns the policy, a new and

independent contract has arisen by which the assignee acquires all the rights of the assignor. 19 Cyc. 635 (3).

When an insurance policy is thus assigned, the company is deemed to have waived all defenses available against the assignor at such time, not inhering in the estate or interest of the assignee, and also all breaches of conditions, past or present, of which it then knew. 19 Cyc. 795; Hall v. Niagara F. Ins. Co. 93 Mich. 184, 18 L.R.A. 135, 32 Am. St. Rep. 497, 53 N. W. 727; Ellis v. Insurance Co. of N. A. 32 Fed. 646.

When policies of insurance are canceled, the insured or his assignee is entitled to a return of the unearned premiums. Phœnix Assur. Co. v. Munger Improved Cotton Mach. Mfg. Co. 92 Tex. 297, 49 S. W. 222.

While courts, under the circumstances here existing, are quite unanimous in according some remedy, they are not in harmony in their course of reasoning as to that result. Some proceed on the theory of ratification, some on the theory of adoption, and others on the theory of estoppel. 27 Cyc. 837(g); Poe v. Dorrah, 20 Ala. 288, 56 Am. Dec. 196; Roundtree v. Holloway, 13 Ala. 357; Ross v. Pearson, 21 Ala. 473; Oliver v. Camp, 9 Ala. App. 232, 62 So. 469; Pracht v. Daniels, 20 Colo. 100, 36 Pac. 845; Goodnow v. Wells, 76 Iowa, 774, 38 N. W. 172; Goodnow v. Stryker, 61 Iowa, 261, 16 N. W. 486; Holbrook v. Clapp, 165 Mass. 563, 43 N. E. 508; Greenland v. Weeks, 49 N. H. 472; Nutter v. Sydenstricker, 11 W. Va. 535; Lee v. Virginia & M. Bridge Co. 18 W. Va. 299; Barnett v. Watson, 1 Wash. (Va.) 372.

A contract is only a meeting of the minds of the parties as to certain reciprocal obligations. Contracts are construed under certain well-defined rules, some of which are declared by our statutes. Comp. Laws 1913, §§ 5896, 5903, 5907, 5909, 5915.

"Although, on its face and by its express terms, the contract is obligatory on one party only, yet if the intention of the parties and the consideration upon which the obligation is assumed is that there shall be correlative obligations on the other side, the law will imply it." 9 Cyc. 333 (III).

And, in case of lack of mutuality at its inception, such defect was cured by the subsequent sale of the property by the promisor, after full performance by the promisee. 9 Cyc. 333 (V).

If in the progress of the trial evidence is introduced by either party

*at variance* with the issues as shown by the pleadings, without proper objection, the error is waived and the court may properly instruct in relation to the whole case as covered by the evidence having reference to the issues actually litigated by the parties, regardless of the pleadings, but in accord with the *theory* upon which the cause was tried. 11 Enc. Pl. & Pr. 167; 38 Cyc. 1616, and cases cited in notes 25–27; Georgia Southern & F. R. Co. v. Perry, 8 Ga. App. 427, 69 S. E. 493; Totten v. Stevenson, 29 S. D. 71, 135 N. W. 715; Johnson v. Caughren, 55 Wash. 125, 104 Pac. 170, 19 Ann. Cas. 1148; Missouri River Transp. Co. v. Minneapolis & St. L. R. Co. — S. D. —, 147 N. W. 82; McKee v. Garner, — Tex. Civ. App. —, 168 S. W. 1031.

Where the evidence in support of a given fact is conclusive, and not controverted by other evidence, the judge in his instructions may assume such fact as proved. 11 Enc. Pl. & Pr. 132 (g); 38 Cyc. 1667, and voluminous notes.

BURKE, J. In March, 1910, the defendants became the owners of a brick dormitory located near the University at Lincoln, Nebraska. At that time the building was insured against fire to the amount of about $39,000; against tornado in the sum of $37,000; and there was a small plate-glass insurance. The fire insurance was carried in eight different policies ranging from $1,250 to $12,000; and the tornado insurance in five policies ranging from $2,000 to $12,500. The policies were written by various companies and expired at different dates. The prior owner had purchased all of said insurance from a local company known as the Safe Deposit Insurance Agency, the president and principal owner of which was the plaintiff, Barkley. Barkley had also rendered other service to the prior owner, such as looking after repairs, rentals, bills, etc. Naturally, defendants and plaintiff were brought together, and, as defendants were nonresidents, an attempt was made to secure the services of plaintiff to look after the property. There is conflict as to the conversation between plaintiff and the defendant Maurice Quick, the father. It is conceded that Quick told Barkley to renew the insurance policies as they expired, and this was done. Plaintiff testifies that Quick asked him to look after the property in the same manner that he had been doing, but this he refused to do, but did agree to give the property a general supervision; that is, give advice

to the matron, engineer, and janitors, and to show about any prospective purchasers whom defendant might refer to him, or any who might inquire about the property. For this service he was to receive the sum of $500 in case the building was sold. He further testifies that defendant bought of his company the insurance and agreed to pay therefor. Defendant, on the other hand, testified that there was no agreement to pay plaintiff the sum of $500 or any other sum for the care of the building or aiding in the sale thereof, and that, as far as the insurance policies are concerned, it was understood that he, Quick, was to be liable only for the amount of insurance premiums up to the time of the sale of the property, and that thereafter the new purchaser should assume the liability, or that the policies should be canceled. Passing this dispute for a minute and proceeding to the facts before us, it is admitted that about November, 1910, the defendant sold the building to one Farrington and assigned the insurance policies to said purchaser. The Farrington company in turn sold the building to one Matters and likewise assigned the insurance policies. A further dispute arises between defendants and Farrington as to whether those policies were assigned as fully paid, but that is not, of course, directly involved. Plaintiff's company attempted to collect the premiums from Matters, Farrington, and the Quicks, but was refused payment in each instance. They, thereupon, attempted to cancel the policies by writing across the face of the same the word "canceled" or its equivalent. The owner of the building, Matters, insisted that the policies were paid up and that he had purchased them as such; took up the mattter with the various insurance companies, and forced them to reinstate said policies. Plaintiff brings this action as assignee of his company upon two counts,— first, for the $500 sale commission; and, second, for the premiums due upon the insurance policies. The action was tried to a jury below, who found for plaintiff in the full sum demanded. Appellant makes four complaints of the conduct of that trial,—first, he insists that there was not sufficient evidence to go to the jury upon the first cause of action, to wit, the $500 item; second, he insists that there was not sufficient evidence to go to the jury upon the second cause of action, to wit, the insurance premiums; third, he claims there was error in the admission of evidence; and, fourth, he claims error in the charge to the jury. We will consider each in a separate paragraph.

33 N. D.—9.

(1) It is, of course, elementary that upon a motion to direct a verdict in favor of either party the court will accept as true the evidence produced by the opposite party. If there is sufficient competent evidence to sustain the verdict the same will not be disturbed. It is not material that there was a conflict in the evidence. Nor are we interested in defendant's version of the contract.

With this in mind we examine the record and find that plaintiff testified as follows:

He (Quick) called me down to the hotel to talk over the subject of my looking after the property for him, and he said . . . that he wanted me to look after it and continue to look after it as I did for Mr. Hayes—and I said I could not give the attention to it that I had done for Mr. Hayes, that it had been too great a bother to me in my business. . . . He said he wanted to dispose of it, and I said in that I could be of material assistance to him. He said he might refer a number of people to me. He wanted me to see the different real estate men in Lincoln and tell them this was for sale or trade, and he gave me an idea of what he wanted me to do with it. He wanted to trade for land, especially. He wanted to get out of debt, and I said I would do what I could for him. And he said if he had any outside people that he would send them to me. . . . I said I would give it a general supervision in the way of assisting the people in charge of it.

Q. Who was in charge of it?

A. Mrs. Betts, an old school-teacher, who collected the rents and paid the bills. He asked me to take charge of that and what I would charge for that. And I said that was the part of it I wanted to get rid of as much as I could. . . . I advised the people; and having supervision of it and that I could not name the price and that I would name it later, and I did. And he said for helping to dispose of the building or selling it he would give me $500.

Q. What did you say to it?

A. I agreed to it. It was satisfactory to me. . . .

Mrs. Betts was also a witness, and in a measure corroborated plaintiff's version of the contract. She was asked:

Q. How many times do you suppose within the period of Mr. Quick's ownership did you advise with Mr. Barkley?

A. Really, I could not say; quite often. During all the period different matters kept coming up about a large building like that, and I did not feel like using my judgment about them. And I always consulted Mr. Barkley—I was told to do so by Mr. Quick. . . .

Q. Can you not give me some idea of what the things you would have to go to Mr. Barkley about and ask his judgment?

A. Well, about the engineer and about different matters and about coal. Where I should buy it, and all sorts of things that anybody would like to have some help about. . . . Anything that was important enough. Sometimes something would give way and we would have to make repairs. The boiler would burst,—all sorts of things would happen. . . . We had to see that everything was in order, don't you know, all kinds of repairs had to be made. . . . Mr. Quick told me I should consult with Mr. Barkley whenever I needed his advice.

Q. You may state whether or not you did so consult with Mr. Barkley.

A. I did.

Q. Frequently, or otherwise?

A. Frequently. Whenever anything came up that I wanted some advice about I went to him. . . .

Q. You may state whether or not during the time that Mr. Quick owned it, Mr. Barkley ever brought a person over there to look over the building with a view of purchasing?

A. He did. . . . He did it a number of times.

Moreover, there is a letter in evidence, concededly written by the defendant to plaintiff, which contains the following language: "Have you been able to do anything along the University line of a trade?" And in another letter written by defendant to plaintiff, dated May, 1910, he asked plaintiff to obtain for him certain tax statements. We have no hesitancy in saying that this evidence, if true, and for the purpose of this motion it is so considered, is sufficient to support a verdict in favor of plaintiff upon this cause of action, and the judge was justified in submitting the matter to the jury. Appellant has much to say of the indefinite nature of the services to be performed. There is no set form for commission contracts. The owner of the property

may contract for such services as he desires. In this case plaintiff was not hired to sell the property but to assist in making a sale. Nor is the contract unenforceable because the $500 was not to be paid until Quick sold the property. Nor is the contract unilateral. 9 Cyc. 333 (III–V).

(2) The same general observation can be made under this heading. If there is any credible evidence supporting plaintiff's theory of the case it was proper to submit the question to the jury. Again assuming the truth of plaintiff's testimony, we find all of the insurance policies upon their face purporting to be fully paid. It is conceded that defendant requested that such policies issue. The law, therefore, implies a promise to pay the premiums. True, defendant claims that he ordered them either canceled or the obligation transferred to the new purchaser, but this is flatly contradicted by plaintiff himself and by several circumstances to which reference will hereafter be made. Plaintiff testifies that his company remitted to the various insurance companies the premiums immediately after the first of each month. The corroborating circumstances to which reference has already been made relate to the assignment of the policies as paid up. When the property was sold by the Quicks to Farrington, the policies, as we have stated, were assigned to Farrington and the assignment accepted by the insurance companies. At this time all of the premiums had been paid in full to the various insurance companies. They had at that time a positive value of something like $900.

Mr. Farrington testifies:

My recollection is that in the transfer, Farrington & Company were to get the building and the land . . . and the policies—paid-up policies—were settled for in full by us.

Q. My question was, whether or not the policies that were assigned to you and turned over to you, whether so far as the premiums due were to be paid out for the term of the policies—

A. They were to be paid up in full.

Q. In your negotiations with the Quicks did you at any time, directly or indirectly, agree to pay any premiums on any of these policies?

A. No, I did not. . . .

Q. What you paid you paid to Quick?

A. Yes, sir.

Q. Did you ever agree to pay plaintiff . . . any premiums on any of these policies?

A. Not one cent. . . .

Q. Had they told you that they were paid in full?

A. They told me—for the sum we paid, I was to get policies assigned to me in full force and effect for the term unexpired. . . .

Q. And the turning over of the policies, the actual physical act, was done by whom?

A. By the Quicks. They were delivered either by Arthur Quick or his father, Maurice Quick, and turned over to us at that time.

Q. And with the proper assignments on them?

A. Yes, sir, the assignment. . . . In the contract which we made with the Quicks we agreed as follows: "Party of the first part hereby agrees to carry $35,000 fire insurance and $20,000 tornado insurance . . . in favor of the holder of the above-named mortgage."
. . .

Q. He told you it was all paid up?

A. Yes, sir. Absolutely, yes.

As corroborating his version there was produced a letter written by Farrington to Quick, December 8, 1910, about twenty days after he had purchased the property, from which letter we quote: "We have a letter this morning from Mr. Barkley, of Lincoln, in which he writes us about unpaid premiums on insurance policies covering the Lincoln Building, which you sold to us, amounting to $861.90. We are surprised to get information that this premium has not been paid, and hope that you will give this your very prompt attention."

We have not set out all of the evidence, nor have we given any of the defendants' evidence upon this phase of the question. What we have quoted is, in our opinion, sufficient to require the submission of the question to the jury. There is no merit in the suggestion of appellant that plaintiff had voluntarily paid defendant's debt. Quick's obligation was to the local agency, not to the insurance companies themselves. He had requested plaintiff to buy him insurance.

(3) The third group of assignments challenged the ruling of the court in excluding testimony by defendants of the nature of their

dealings with Farrington. The trial court excluded this conversation upon the theory that it would not bind plaintiff, who was not present and did not hear of the same. This was proper and is elementary. Later in the case the same matter was gone into thoroughly in order to bind the defendant Quick, who was present and participated in the conversation. There is no inconsistency in the court's rulings. The mere fact that the evidence was introduced as an admission by defendant against his interest does not render it admissible against the plaintiff, who was absent. The rulings of the trial court were clearly correct.

(4) The fourth group of assignments challenged the instructions to the jury. The first portion of the charge excepted to is as follows: "Now, gentlemen of the jury, the defendants in this case admit, or Maurice Quick admits, that sometime in March, 1910, he authorized the plaintiff to procure the insurance in question for him. This is undisputed." Appellant contends that the court took from the jury a disputed question of fact, and insists that throughout the trial defendants had insisted that the insurance had been procured from the insurance companies direct, though from plaintiff's company as an agent. An examination of the testimony, however, does not bear out appellant's contention. Plaintiff testifies that "he (Quick) said I should rewrite the insurance expired," and the defendant Quick testifies: "He was to write up the policies and I was to pay him." We agree with the trial court that the undisputed evidence was that plaintiff's company was to procure the insurance. There was, therefore, no error in this portion of the charge. Another paragraph of the charge to which exception is taken reads as follows: "It is undisputed in this case that the Safe Deposit Insurance Agency paid out for this insurance." Appellant insists that this is contrary to the pleadings in the case which allege that they sold insurance to the defendants. We are unable to see any error in this statement of the court. We have already quoted the testimony of plaintiff to the effect that shortly after the first of each month his company sent in to the various insurance companies all of the premiums for those policies. Another paragraph of the instructions, to which exception is taken, is as follows: "The court, therefore, instructs you as a matter of law that if you find by a fair preponderance of the evidence, that on or about March, 1910, the defendant Maurice Quick, acting on behalf of himself and his son,

Arthur A. Quick, authorized the plaintiff, Mr. Barkley, to procure the insurance in question and write such insurance, and you further find from a fair preponderance of the evidence that the plaintiff did, through the Safe Deposit Insurance Agency, write such insurance, and you further find by a fair preponderance of the evidence, that such company paid the premiums on such insurance, . . . your verdict must be for the plaintiff (upon that cause of action)." And again the court says: "The court will say that the policies in question, as shown by the evidence, were assigned by the defendants to Farrington & Company. Now, while the policies were still the property of Mr. Quick, if he had presented the same he might have had them canceled, but as against Farrington & Company, after they had been assigned by Quick to them, he would have no right or authority to cancel such policies as against Farrington & Company, while owned by him, and he was in possession of such policies, without at least returning the unearned premiums to them." The above instructions are the only ones to which exception is taken. There is no error in them. Finding no error in the record, the judgment is accordingly affirmed.