[File No. 6082.]

WARREN TAYLOR, Respondent, v. MINNEAPOLIS, SAINT PAUL & SAULT STE. MARIE RAILWAY COMPANY, a Corporation, Appellant.

(248 N. W. 268.)

Opinion filed April 22, 1933.

*Dullam & Young* and *Conmy, Young & Conmy* (*John E. Palmer*, of counsel), for appellant.

334

F. E. McCurdy, for respondent.

Burr, J. Plaintiff sues on ten causes of action, claiming damages in excess of $12,000 by reason of a prairie fire alleged to have been caused by employees of the defendant burning grass on the defendant's right of way and permitting the fire to spread to the premises of the plaintiff and other claimants, these claimants having assigned their claims to plaintiff. The defendant enters a general denial, after admitting its own incorporation.

At the close of the plaintiff's case the defendant moved for a directed verdict. The motion was renewed at the close of the case and was denied by the court.

The jury returned a verdict in favor of the plaintiff for $6,541.76 and from the judgment entered thereon the defendant has appealed.

There are but two specifications of error, though stated in three forms—it is alleged the court erred in overruling the motion for a directed verdict, and erred in entering an "order denying the defendant's motion to modify the judgment by eliminating witness fees on the first trial of this action."

The only question presented on the first motion is the sufficiency of the evidence to sustain a verdict; regardless of conflicting testimony; (Thompson v. Smith, 45 N. D. 479, 480, 178 N. W. 430) and in

determining this we must adopt that view of the evidence which is most favorable to the opposing party. Chubb v. Baldwin Piano Co. 54 N. D. 189, 192, 208 N. W. 975; Schantz v. Northern P. R. Co. 42 N. D. 377, 385, 173 N. W. 556; Barkley v. Quick, 33 N. D. 124, 130, 156 N. W. 544; John Miller Co. v. Klovstad, 14 N. D. 435, 440, 105 N. W. 164; Warnken & Co. v. Langdon Mercantile Co. 8 N. D. 243, 244, 77 N. W. 1000.

The plaintiff does not contend that the fire was set by sparks from a passing train; but that employees of the company, engaged in burning off the right of way, in some way permitted the fire to spread—either by smouldering embers which were fanned into flame and driven by the wind, or by fire which escaped when set, or by some other method directly traceable to the negligence of these employees.

It is apparent therefore that if there be evidence in plaintiff's case which reasonable men can say substantiates his theory then there was no error in denying the motion.

For a proper understanding of the issue it may be well to state some undisputed facts. That property was destroyed by fire on the day involved is beyond question and the amount of the verdict is not in dispute. Part of defendant's railway system runs in an easterly direction, angling somewhat to the northeast, through sections 3, 4, 5 and 6 of township 137, range 78. On October 5, 1928, a prairie fire started on or near that part of the defendant's right of way in the southeast quarter of section five and the southwest quarter of section four, which lies south of the track, the exact spot being in dispute. The right of way is fifty feet wide on each side of the center of the railroad track at the points involved. Adjacent to and south of the right of way is what is called a prairie road which, beginning at the point where the section line between sections 5 and 6 crosses the track on the south, runs roughly parallel to the railroad track, on easterly through and past sections 5, 4 and 3, and averages 150 to 200 feet south from the track. This road is the familiar prairie road with well-worn wheel tracks and grass growing in the center. To the south of this road is an old fire break which had not been plowed since 1926. Between the prairie road and the railroad track is what was called the new fire break, three fourteen-inch furrows wide, and plowed first in 1927, and re-plowed in July, 1928. The witness Scarborough had his home on

the west side of the south west quarter of section three, and over one quarter of a mile north of the track. The plaintiff's home was close to the south west corner of the south west quarter of section four and south of the track. A place known as Welch Spur is about equal distance between them. Taylor crossing is the spot where the section line between sections 4 and 5 crosses the track. The witness O. P. Welch had a flax field in section 5, lying north of the track and coming down to about sixty rods from the right of way.

The burned area involved—whether burned over on October 2 or October 5 and thus the result of two separate and distinct fires—had its northern limit on the south right of way close to the track and its northwestern limit a few rods east of the quarter line running north and south through section 5. From these points it extended along the right of way over to the Taylor home northeast, and from these northerly points spread in a southeasterly direction several miles, widening as it spread. Defendant's witness Stewart lived near the south west corner of the south west quarter of section 6, about a mile and a half from the portion of the burned area nearest to him.

When we consider plaintiff's case, we note: Mr. O. P. Welch testified that on October 5th he was working in his flax field, beginning work about eight a. m. Between nine and ten o'clock that morning he saw smoke coming from his land on the south side of the track, in section 5. His flax field ran north and south and, as he came south cutting, he saw the smoke in front of him. The wind at that time was from the southwest. Sometimes the smoke would be heavier than at other times. At that time he saw a portion of the railroad equipment for the section men—a hand car standing at the crossing on the east side of section 5—and saw the section men in that neighborhood about that time. About noon he finished his work and went to his home a mile and a half north. At that time the wind had risen somewhat and veered to the west—the smoke still rising— and he noticed "the smoke was getting stronger there." He kept his eye on it and as it got heavier the smoke "seemed to be scattered along" and then he "saw the fire go out over along toward the east."

Another witness for the plaintiff testified he drove east along the prairie road about noon; he saw the fire guard, and saw there was fire between the fire break and the track. Later, on cross-examination he

said it was the next day that he noticed the burned area; but again he testified that he saw this particular fire "on the road that goes by" the plaintiff's place. Two or three days afterwards he was over the same territory and he saw where the fire had burned. Robert Welch testified that for two or three hours in the forenoon of October 5 he saw smoke along the right of way close to the east line of section five.

Another witness for the plaintiff testified that on October 5, about noon, he drove along that road, crossing the railroad track near the plaintiff's buildings. He came to the railroad right of way immediately south of the track and noticed "it was burned part of the way between the fire guard and the track, burned all the way up west," and when asked if "any fire burning then?" answered, "yes, sir, some farther west." He testified the fire was between the fire guard and the track. On cross-examination he said he saw smoke and a little flame on the right of way about the middle of section 5. He testified that there were patches of grass remaining unburned on the right of way between the place where he saw "smoke west and where the fire was;" although it was about a week after this before he knew of the loss by fire.

John Welch, another witness for the plaintiff, though working a mile and a half or two miles from this place, saw "smoke on the south side of the railroad" near the center of the section, about nine o'clock that morning, saw this in different places, and this continued for a "couple of hours off and on."

Another witness for the plaintiff testified that on the day of the fire he was at work about three miles away; that shortly before noon he noticed smoke showing up and realizing it was a prairie fire went over to help to fight it.

The witness Scarborough said that on the forenoon of October 5, 1928, and between nine and ten o'clock of that day, he "observed carefully there was quite a bit of smoke along the railroad track for about a mile and three quarters," from where he was working on section 3, and that this smoke came from the south of section 5. He testified that it seemed to follow the railroad track east for what he judged was one half to three quarters of a mile. He observed the smoke all forenoon but more perceptibly about half past ten. It "then gradually grew lighter and then later on it was larger—more smoke." This was

about 11:30, and it would come in a cloud and gradually disappear. It was so close to the track that from the angle from where he was he says it appeared almost as if it was on both sides of the track.

John Elias testified that "close to noon" on the day of the fire he traveled over the country from Bismarck and "came on that road from the west going east, alongside the track on that prairie road;" that he noticed a "handcar right along the side of the road" and there were two section men there; there was a fire burning right close to the road between the prairie and right of way. He did not go to the Taylor place but went on to the Scarborough place which is about one half mile east of Welch's Spur, the Spur being between the Scarborough place and the Taylor place. The section men were burning west of Scarborough's place. This witness had come up on the road which is about two miles west of the Scarborough place and then turned east on the prairie road, which brought him past the place where the fire must have originated. It was there that he saw the section men burning. It was a point about two miles west of Scarborough's place. He said the section men were on the south side of the railroad track. The section line upon which he came, according to testimony which appears to be undisputed, is the section line between sections 5 and 6. The prairie road turns east from there along the south side of the right of way and the western portion of the burned area which appeared on the right of way, so far as this case is involved, approximates closely to the quarter line on section 5 which would make it about one half mile east of where the prairie road joins the section line between 5 and 6. Consequently if this witness is to be believed, "close to noon"—the time set by witness O. P. Welch and others as being the time when they saw heavier smoke along the right of way—the section men were actually burning off the right of way at or near a place where the burned area reached its northern and western points. Despite the fact that the section men testified that this area was burned three days prior thereto this testimony was properly before the jury.

The defendant produced witness Stewart who testified that frequently that forenoon he had scanned the horizon easterly as he was expecting and looking for the arrival of a relative. Between noon and one P. M. that day, he was building a fence on a high spot south of his home, and noticed an automobile coming from the south on the section line

between sections 5 and 6 and watched it until he noticed it turn to the east when it reached the prairie road. He says that two or three minutes after the car passed he noticed a fire in the prairie road about the quarter line of section 5. At that time the wind had changed to the west and increased in velocity. He said the fire jumped the old fire guard and then started out to the east and south. Defendant says this testimony cannot be disregarded; that it is unimpeached and is therefore decisive; that the photographs introduced in evidence absolutely corroborate this testimony, that the examination of the burned area after the damage had been done showed that grass on the north side of the road had not been burned even in the fire area.

The testimony of the plaintiff's witnesses showed that smoke was rising from that very same place several hours before Mr. Stewart saw this automobile. Where there was smoke there had to be fire and if there was smoke rising from that very same burned area between nine and ten o'clock there must have been fire there several hours before Mr. Stewart observed this automobile.

Whether the rising wind with its change of direction fanned smouldering embers into flames, and these were thrown on to unburned patches of grass and thus spread, was for the jury to determine from the evidence. Mr. Stewart did not see any sparks from the automobile set fire to the grass. He does not claim to have seen any cigarette stub thrown out or any match. He saw an automobile passing along that road and shortly thereafter he saw a fire start. The time he saw the fire start coincides with the time that the witness Welch says he saw the flame but that is hours after plaintiff's witnesses saw the smoke. Whether the passing of the automobile over that road was a mere coincidence was for the jury to determine.

We have selected these witnesses as illustrative of the conflict in the testimony. There is further testimony on both sides in regard to hours and spots and smoke, as well as examination and other observation after the fire covering a period beginning shortly after the fire to a period many hours or even days thereafter.

It is very evident from the testimony of plaintiff's witnesses, if they are to be believed, that several hours before Mr. Stewart saw this automobile go by there was smoke arising from and fire on the right of way

of the railway company at the place south of the track where the north part of the burned area was.

It was perfectly possible therefore that the section men had burned the right of way a day or two before and smouldering embers remained. The wind was from the southwest originally and therefore the fire would not cross the fire break; but when the wind veered to the west and then to the northwest and increased in velocity it was not only possible but probable that embers could be fanned into a flame, and be thrown across. No one testifies that no patches of grass were left. The testimony shows conclusively there were patches of unburned grass through the burned area.

That the section men had been burning the right of way at this particular spot during the first days of October is undisputed. The section men claim that this particular portion of the right of way had been burned three days before; that while it was a fact that they were doing a little work at that place that day it was merely the repairing of a broken angle iron in the track, that they left that territory about ten o'clock and that while they did burn on the right of way that day it was at a point two or three miles east of there. There is testimony which corroborates these witnesses. But witness Elias testified he saw them burning that portion of the right of way that forenoon.

In order to show negligence it was not necessary for the plaintiff to show that the section men were there at the time the wind fanned the burning embers into a flame, if this happened.

The main reliance of the defendant is on the testimony of Mr. Stewart which would indicate the fire did not start until between 12 and 1 o'clock, almost immediately after the automobile passed over the road, and on the argument that plaintiff's case rests upon deductions, assumptions, and probabilities. Defendant claims the plaintiff must assume there were smouldering embers left, that there is a possibility that these were fanned into flame because the right of way was burned over three days before and thus the fire was caused by negligence of the employees; but that such possibility is not sufficient to justify a verdict.

It is incumbent upon the plaintiff to show that the fire was caused by the negligence of the defendant's employees. To do this he limited

himself to tracing the origin of the fire to the defendant's right of way. The prairie road was not on the right of way.

There was a fire and there was damage. The theories of the case resolve themselves into two—plaintiffs claim that the fire came from the burning of the right of way—whatever date this burning was—and defendant's theory that it must have been started on the road by the passing automobile or some of its passengers. There is nothing in the evidence to indicate any other cause. There is evidence from which the jury could find it came from the cause proffered by plaintiff, either from smouldering embers or the right of way being burned by the employees that day and that these employees left without putting out the fire, so when the wind changed the fire was fanned. Had no smoke been observed until the time of the passing automobile then the argument of the defendant to the effect that the fire and the smoke had been caused by the automobile or its occupants would have much greater weight; but we are not determining the preponderance of the evidence. We are determining whether there was any evidence to go to the jury. There was ample testimony showing burning by employees that day, with fire and smoke long before the automobile passed by, and the change of the direction of the wind and increased velocity was a factor which the jury could consider.

Some of plaintiff's witnesses had claims against the railroad company which claims had been assigned to the plaintiff; but this the jury knew.

Were the question one of weight of the evidence, or the exercise of discretion on the part of the trial court in granting a new trial because of the unsatisfactory state of the evidence it would be an entirely different matter.

We are asked to say, however, that the court was wrong in ruling there was no evidence whatever to submit to the jury showing sufficient probability of the fire originating from the negligence of the employees in not seeing that the fire had been extinguished when they burned the right of way. We believe there was evidence to submit to the jury. This being so the court was justified in refusing to direct a verdict.

The second issue involves the order of the court "denying the defend-

ant's motion to modify the judgment by eliminating witness fees on the first trial of this action."

Heretofore a jury had been impanelled, but being unable to agree was discharged. On this abortive trial plaintiff incurred costs and disbursements aggregating $171—which included the per diem and mileage for nineteen witnesses, fifteen of whom appear as witnesses in the second trial.

When judgment was entered on the verdict rendered in this case the plaintiff included this $171 in his costs and disbursements. The defendant moved the court to amend the judgment by striking out this amount being "the costs of the first trial of said action wherein the jury, disagreed." The motion was denied and defendant brings the matter before this court for review.

During the first trial the defendant made a motion for a directed verdict. The trial court, in its memorandum opinion, decided the defendant was entitled to judgment; but, before a formal order to this effect was signed, plaintiff moved for a new trial on the ground of newly discovered evidence, which motion was granted.

Allowance of costs is a matter of statute. Our statute, § 7789, says: "In civil actions there may be allowed to the prevailing party upon the judgment certain sums by way of indemnity . . . in addition to the disbursements now allowed by law. . . ." Section 7793 requires the clerk to tax "in favor of the prevailing party his necessary disbursements," which include his witness fees.

It is true this court dismissed the appeal of the defendant from the order granting the new trial, but this was based on the holding that in the absence of an order for judgment or a judgment, the order granting a new trial was "merely confirmatory of the rights of the parties to have the undetermined issues of fact determined in the ordinary manner by a trial by a jury."

Had the trial court completed its determination and signed an order for judgment for the defendant it is clear granting the new trial, being a discretionary matter, was a favor to the plaintiff.

In the case in which these costs were incurred the plaintiff was not the prevailing party. He failed to convince the jury he was entitled to a verdict; and prevented the defendant from getting judgment of dismissal by his showing for a new trial.

We must consider the case as if the formal order had been signed and thereafter set aside. In such case the costs incurred on the first trial could not be taxed by plaintiff even though he prevailed on the second trial. "The defendant was hardly in fault, and the new trial was not made necessary by it. It was, as a matter of fact in the nature of a privilege to the plaintiff." See Corbett v. Great Northern R. Co. 28 N. D. 136, 150, 148 N. W. 4.

The judgment therefore is modified to the extent of deducting therefrom the item of $171 of costs and disbursements of the first trial, and with this modification the judgment is affirmed.

NUESSLE, Ch. J., and CHRISTIANSON, BIRDZELL and BURKE, JJ., concur.